IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA L. REGAN, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 08-5923 |
| | : | |
| LAW OFFICES OF EDWIN A. | : | |
| ABRAHAMSEN & ASSOCIATES, P.C., et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

YOHN, J.                                                          December __, 2009

      Plaintiff, Lisa L. Regan, sues the Law Offices of Edwin A. Abrahamsen & Associates,

P.C. ("EAA"), and Commonwealth Financial Systems, Inc. ("CFS"), seeking damages and other

relief for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*

("FDCPA" or the "Act").  Plaintiff alleges that EAA violated the Act by contacting her directly,

by phone and in writing, after being informed that she was represented by counsel, and by

placing collection calls to her parents' phone number.  Plaintiff also alleges that this pattern of

communications by EAA was harassing and abusive.[1]  Defendants concede that at least some of

EAA's communications violated the FDCPA but argue that they are not liable because they are

entitled to the "bona fide error" defense set forth at 15 U.S.C. § 1692k(c).  The parties have filed

---

[1] Plaintiff alleges that "CFS, a debt collector, is liable for the actions of [EAA], its debt collector."  (Compl. ¶ 15; *see also* Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. and in Support of Pl.'s Cross-Mot. for Summ. J. ["Pl.'s Mem."] 1.)

cross-motions for summary judgment, both of which are limited to the issue of defendants'

liability. For the reasons that follow, the court will deny defendants' motion for summary

judgment and will grant in part and deny in part plaintiff's cross-motion for summary judgment.

## I.     Factual Background

Defendant CFS, a debt collector, purchased two accounts claimed due by plaintiff

("Account 1" and "Account 2") and obtained a default judgment against plaintiff on each account

in the Court of Common Pleas. (Pl.'s Counter-statement of Material Facts in Support of Her

Cross-Mot. for Summ. J. ["Pl.'s Counterstatement"] ¶ 1; Defs.' Resp. to Pl.'s Statement of

Materials Facts ["Defs.' Resp."] ¶ 1; Pl.'s Resp. to Defs.' Statement of Material Facts ["Pl.'s

Resp."] ¶ 7.) The judgments ultimately were sent for collection to EAA, a law firm that focuses

on the collection of consumer debt. (Pl.'s Counterstatement ¶¶ 1-2; Defs.' Resp. ¶¶ 1-2.)

In February 2007, attorney Thomas J. Bass sent EAA a letter advising that he represented

plaintiff in connection with the judgments and requesting that all future correspondence and

inquiries concerning the matter be directed to his attention. (Pl.'s Counterstatement ¶ 6; Defs.'

Resp. ¶ 6; Pl.'s Ex. J (Feb. 2, 2007, letter from Bass to EAA).) A few months later, in May

2007, the parties settled the matter, agreeing to a payment arrangement whereby plaintiff would

pay a specified amount each month until the balance on her accounts was paid in full. (Pl.'s

Counterstatement ¶ 7; Defs.' Resp. ¶ 7; Compl., Ex. A (May 2, 2007, letter from EAA to Bass

reflecting agreement)).) Plaintiff thereafter continued to be represented by Bass. (Pl.'s

Counterstatement ¶ 8; Defs.' Resp. ¶ 8.)

Although it is EAA's practice to stop contacting a consumer once the consumer is

represented by counsel (or once a payment plan is agreed upon, if the consumer is not

represented by counsel), EAA contacted plaintiff by phone and in writing on several occasions in 2008.  (Pl.'s Counterstatement ¶¶ 9-11; Defs.' Resp. ¶¶ 9-11.)  In particular, EAA managing attorney Michael Ratchford initiated calls to plaintiff through Global Connect, the firm's auto-messaging service, on both of her accounts on January 10, 12, and 17, 2008, and on Account 2 only on January 20 and February 3, 2008.  (Pl.'s Counterstatement ¶¶ 12-14; Defs.' Resp. ¶¶ 12-14.)[2]  These "blast" phone calls were placed to plaintiff at her work number and also at her parents' telephone number.[3]  (Pl.'s Counterstatement ¶ 15; Defs.' Resp. ¶ 15.)  In addition, EAA sent collection letters directly to plaintiff on Account 2 on March 14, 2008, and on both of her accounts on April 28, 2008.  (Pl.'s Counterstatement ¶ 19; Defs.' Resp. ¶ 19; Pl.'s Ex. L (letters).)

Both the calls and the letters that plaintiff received were sent through automated

---

[2] Although the parties agree that Ratchford initiated calls to plaintiff on both of her accounts on January 10, 12, and 17, 2008 (Pl.'s Counterstatement ¶¶ 13-14; Defs.' Resp. ¶¶ 13-14), it is unclear whether plaintiff actually received separate calls on each account as, according to Ratchford, the Global Connect system "takes off duplicates" such that only "[o]ne phone message per day would be left" on a consumer's phone number even if the consumer had multiple accounts (Defs.' Ex. A ["Ratchford Dep."] at 115-16; *see also* Pl.'s Ex. K (Account 1 notes at 4, showing, with respect to calls placed on Account 1 on January 10, 2008, "Answering Machine – No message left")).  Similarly, while the parties agree that the notes for plaintiff's accounts "show two sets of calls placed on January 10 and 12" (Pl.'s Counterstatement ¶¶ 13-14; Defs.' Resp. ¶¶ 13-14), it is unclear whether two sets of calls actually were placed as Ratchford testified that the second entries for those dates were likely duplicates (Ratchford Dep. 112-13).

[3] Plaintiff resides with her parents, but she does not share their telephone number.  (Pl.'s Counterstatement ¶ 11.)  She instead uses her own cell phone number, which she had provided to EAA months earlier.  (*Id.* ¶ 16; Defs.' Resp. ¶ 16; Pl.'s Ex. F ["Pl.'s Dep."] 43-45, 51.)  In particular, plaintiff provided her cell phone number to EAA by phone in February 2007, and in writing in March 2007, in her responses to interrogatories in aid of execution in the Court of Common Pleas action.  (Pl.'s Counterstatement ¶ 16; Defs.' Resp. ¶ 16; Pl.'s Dep. 44-45, 51.)  EAA also had learned in or around January 2007 that the phone number it had for plaintiff was registered to a William Regan.  (Pl.'s Ex. H ["Pietrowski Dep."] 96-98; Pl.'s Ex. P.)

processes to lists of accounts compiled by Ratchford or other EAA personnel using the Commercial Legal Software ("CLS") program that the firm used to manage its collection accounts. (Defs.' Statement of Material Facts in Support of Their Mot. for Summ. J. ["Defs.' Statement"] ¶ 5; Pl.'s Resp. ¶ 5; Pl.'s Counterstatement ¶¶ 12, 20; Defs.' Resp. ¶¶ 12, 20.) Within the CLS program, EAA used numerical "diary codes" to reflect certain account activity and/or status information. (*See* Ratchford Dep. 38; Defs.' Ex. C ["Scavone Dep."] 49; Pl.'s Ex. K ("paperless notes" on plaintiff's accounts showing addition and deletion of various diary codes).) In working on an account, EAA personnel would assign diary codes to the account to reflect such information as, for example, whether the account was a new account, whether the consumer was represented by counsel, whether EAA had a good phone number for the consumer, and whether the consumer had entered into a payment plan. (*See* Ratchford Dep. 38; Scavone Dep. 49; Pl.'s Ex. K.) According to Ratchford, EAA would then use these diary codes to build lists of consumer accounts to receive particular communications, setting the parameters for which accounts to call up based on the diary codes and date ranges. (*See* Ratchford Dep. 36, 40-41, 83-84.) Using the diary codes in this manner, EAA could construct a call list that would exclude all accounts in which the consumer was represented by counsel. (*See id.* at 64.)

Although EAA coded both of plaintiff's accounts to reflect that she was represented by counsel in February 2007, the relevant diary code was deleted from Account 2 in May 2007 and from Account 1 in January 2008, and the code was not restored to either account until May 2008, after plaintiff's attorney contacted EAA. (*See* Pl.'s Counterstatement ¶¶ 21, 23, 26; Defs.' Resp. ¶¶ 21, 23, 26; Defs.' Statement ¶ 19; Pl.'s Resp. ¶ 19.)

In particular, on May 12, 2007, Michael Scavone, an EAA collector who was not

assigned to plaintiff's account, accessed plaintiff's Account 2 to post a payment. (Pl.'s Counterstatement ¶ 26; Defs.' Resp. ¶ 26.) While in that account, Scavone added the diary code for "partial payment arrangement" and deleted the "represented by counsel" code. (Pl.'s Counterstatement ¶ 26; Defs.' Resp. ¶ 26; Scavone Dep. 51-52; Pl.'s Ex. K (Account 2 notes at 3).) Scavone testified that he was "advancing the date on the payment" and should have advanced the "represented by counsel" code as well by deleting and then re-entering the code, as he had been trained to do, but he made a mistake and deleted the code instead.[4] (Scavone Dep. 51-52, 57.) Scavone's actions with respect to Account 2 did not affect plaintiff's Account 1, in which the diary codes continued to reflect that plaintiff was represented by counsel after May 12th. (*See* Pl.'s Ex. K (Account 1 notes at 3-4); Ratchford Dep. 75-76 (acknowledging that "cease and desist: contact counsel" code[5] continued to appear in plaintiff's Account 1 as late as January 2008).) Nevertheless, on January 10 and 12, 2008, Ratchford initiated calls to plaintiff on both of her accounts.

---

[4] Although it is not entirely clear from the record how the CLS software functioned, EAA apparently used the diary feature of the software to generate reminders to revisit particular accounts on specified future dates. According to Ratchford, when accessing an account, EAA personnel would "diary [the account] out for when [they] want[ed] to look at that account again," a function also referred to as "advancing the date" of the account. (Ratchford Dep. 37; *see also id.* at 96-97; Scavone Dep. 51-52.) By advancing the date of an account thirty days, for example, a collector could ensure that the account would appear on his daily diary list on the thirtieth day, reminding him to look at the account that day. (*See* Ratchford Dep. 89-90, 96-97.) When advancing an account, EAA had a practice of advancing the relevant diary codes on the account (including the represented by counsel code) as well, so that the codes also would appear on the daily diary list. (*Id.* at 89-90, 93-94, 98.) To advance the codes on an account, EAA personnel had to delete and then re-enter the codes. (*Id.* at 90, 97-98.)

[5] At some point, EAA ceased using the "represented by counsel" code and began using a "cease and desist: contact counsel" code on both of plaintiff's accounts. The court will refer to both of these codes as the "counsel" code.

Thereafter, on January 17, 2008, John McGraw, another EAA collector not assigned to plaintiff's accounts, accessed Account 1 to delete plaintiff's parents' phone number (most likely as a result of a call informing him that it was a wrong number). (Pl.'s Counterstatement ¶ 23; Defs.' Resp. ¶ 23; Pl.'s Ex. I ["McGraw Dep."] 37.) While logged in to plaintiff's account, McGraw added a code for "secured payment" and then deleted the four previous diary codes, including the counsel code, with a single keystroke. (Pl.'s Counterstatement ¶ 23; Defs.' Resp. ¶ 23; McGraw Dep. 38-42, 51, 64; Pl.'s Ex. K (Account 1 notes at 4).) McGraw testified that he did not notice that there was a "cease and desist" code on plaintiff's account, but he acknowledged that, had he looked back through the notes on the account or pulled up the "diary screen" for the account, he could have determined that plaintiff was represented by counsel.[6] (McGraw Dep. 42-44, 49-50.)

On April 30, 2008, Bass wrote to EAA, directing the firm to cease contacting plaintiff and to send any future inquiries to his office. (Defs.' Statement ¶ 18; Pl.'s Resp. ¶ 18; Pl.'s Ex. N (April 30, 2008, letter from Bass to EAA).) EAA thereafter re-coded plaintiff's accounts as "represented by counsel" on May 5, 2008. (Pl.'s Ex. K (Account 1 notes at 4; Account 2 notes at 5).)

Plaintiff filed this civil action on December 22, 2008, alleging that defendants violated the FDCPA by communicating with her about her debt after being informed that she was represented by counsel, by communicating with third parties (namely, her parents) in connection with the collection of a debt, and by "engaging in conduct the natur[al] consequence of which is

---

[6] EAA placed calls to plaintiff on both of her accounts later in the day on January 17, but thereafter placed calls only to plaintiff's Account 2. (*See* Pl.'s Ex. K (Account 1 notes at 4; Account 2 notes at 4-5).)

to harass, oppress, and abuse any person in connection with the collection of a debt." (Compl. ¶ 35.) Before the court are the parties' cross-motions for summary judgment on the issue of defendants' liability for these alleged FDCPA violations.

## II.    Summary Judgment Standard

A motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A factual issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to avoid summary judgment, the nonmovant must make a showing sufficient to establish each essential element of its case with respect to which it will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation and internal quotation marks omitted). However, "an inference based upon a speculation or conjecture does

7

not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.  Discussion

### A.  FDCPA Violations

#### 1.  15 U.S.C. § 1692c(a)(2)

Under the FDCPA, once a debt collector knows that a consumer "is represented by an attorney with respect to [a] debt and has knowledge of, or can readily ascertain, such attorney's name and address," the debt collector "may not communicate with [the] consumer in connection with the collection of [the] debt" without first obtaining "the prior consent of the consumer . . . or the express permission of a court of competent jurisdiction."  15 U.S.C. § 1692c(a)(2).[7] Defendants concede that the letters EAA sent to plaintiff in March and April 2008 and the calls it placed to her office phone number in January and February 2008, all of which were initiated months after Bass notified EAA that he represented plaintiff, violated this prohibition.  (Defs.' Br. in Support of Their Mot. for Summ. J. ["Defs.' Br."] 5 ("There is no dispute that these communications [sent to plaintiff while she was represented by counsel] were a violation of the FDCPA.").)  It is thus conceded that defendants violated 15 U.S.C. § 1692c(a)(2) as to Accounts 1 and 2, subject to the defense of bona fide error.

---

[7] A debt collector may communicate directly with the consumer where "the attorney fails to respond within a reasonable period of time to a communication from the debt collector" or where "the attorney consents to direct communication with the consumer," *id.* § 1692c(a)(2), but neither of these circumstances is present here.

## 2.     15 U.S.C. § 1692c(b)

Subject to a limited exception for obtaining "location information" about the consumer,[8] the FDCPA also prohibits a debt collector from communicating with third parties in connection with the collection of a debt:

> Except as provided in section 1692b of this title [concerning acquisition of location information about a consumer], without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

15 U.S.C. § 1692c(b).  Defendants argue that there is a genuine factual issue as to whether the calls EAA placed to plaintiff's parents' phone number violated the FDCPA's prohibition against third-party communications, noting that "reasonable minds could differ as to whether this communication was made in order to secure location information."  (Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. ["Defs.' Opp'n"] 2.)  Because defendants knew that plaintiff was represented by counsel at the time the calls to her parents were placed, however, they were prohibited from seeking such location information from anyone other than plaintiff's attorney. *See* 15 U.S.C. § 1692b(6) ("Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall . . . after the debt collector knows the consumer is represented by an attorney with regard to the subject debt and has knowledge of . . . such attorney's name and address, *not communicate with any person*

---

[8] The term "location information" refers to "a consumer's place of abode and his telephone number at such place, or his place of employment."  15 U.S.C. § 1692a(7).

*other than that attorney . . . .*") (emphasis added). As a result, even if the purpose of the calls to plaintiff's parents was to obtain location information,[9] the calls nevertheless violated 15 U.S.C. § 1692c(b). The court thus finds that defendants violated § 1692c(b) as to Accounts 1 and 2, subject to the defense of bona fide error.

### 3.    15 U.S.C. § 1692d

Plaintiff also contends that EAA's repeated calls to her parents and repeated contacts with her at a time when she was both represented by counsel and making payments on her accounts pursuant to a negotiated payment plan violated 15 U.S.C. § 1692d, which prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." (Pl.'s Mem. 16.) Plaintiff does not suggest that the content of any of EAA's communications was harassing or abusive. Rather, she argues that it was harassing and abusive for EAA to continue to contact her while she was represented by counsel and paying on her accounts.[10]

Defendants have not moved for summary judgment as to plaintiff's § 1692d claim. In

---

[9] Defendants have not presented any evidence suggesting that the calls to plaintiff's parents were, in fact, placed in an effort to obtain location information about plaintiff. Moreover, as plaintiff notes, EAA had no need to obtain such location information as plaintiff had informed EAA of her correct telephone number in her March 2007 responses to interrogatories in aid of execution in the Court of Common Pleas action, and also had given her correct telephone number to the EAA collector initially assigned to her file. (Pl.'s Counterstatement ¶ 16; Defs.' Resp. ¶ 16.)

[10] In addition to setting forth the general prohibition stated above, § 1692d specifies six non-exhaustive categories of proscribed conduct. *See* 15 U.S.C. § 1692(1)-(6). The conduct specifically prohibited by the statute includes "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number," *id.* § 1692(5); however, plaintiff does not invoke this statutory subsection, nor does she contend that EAA intended to "annoy, abuse, or harass" her or her parents.

opposing plaintiff's cross-motion for summary judgment as to this claim, defendants rely primarily on their assertion that the communications about which plaintiff complains were sent to her and her parents by mistake, as a result of a coding error in one of plaintiff's accounts. (Defs.' Opp'n 6-7.) This assertion, if true, may suggest that EAA did not intend to harass plaintiff. However, the question for purposes of § 1692d is not what EAA intended but whether "the natural consequence" of EAA's communications was to "harass, oppress, or abuse" plaintiff.[11] *See Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2003) (finding debt collector's intent irrelevant to claim under 15 U.S.C. § 1692d as "[w]hat is determinative is whether 'the natural consequence of' [debt collector's] obscenity-laced message was to 'abuse the hearer'" (citation omitted)).

"Ordinarily, whether conduct harasses, oppresses, or abuses will be a question for the jury." *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985); *see also Neill v. Bullseye Collection Agency, Inc.*, No. 08-5800, 2009 WL 1386155, at *2 (D. Minn. May 14, 2009) (finding that whether an unsophisticated consumer would find the use of the letters "WWJD," an apparent acronym for the religious phrase "what would Jesus do?," in collection letters to be harassing, oppressive, or abusive is an issue of fact); *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 506 (D. Md. 2004) (finding that reasonableness of "volume of calls [by debt collector] and their pattern" was "a question of fact for the jury"). Although summary judgment may be appropriate where the specific conduct at issue unequivocally has – or does not have – the natural consequence of harassing, oppressing, or

---

[11] Although not relevant to the issue of EAA's liability under § 1692d, whether EAA's communications were sent by mistake is, of course, highly relevant to defendants' assertion of the bona fide error defense, discussed *infra* in section III.B.

abusing the consumer as a matter of law,[12] the court cannot say as a matter of law that either is true of the communications at issue in this case. *See Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1516 (9th Cir. 1994) (placing threatening calls to consumer at work after she had twice requested not to be phoned at her place of employment "could rationally support a jury finding of harassing conduct"); *Harding v. Regent*, 347 F. Supp. 2d 334, 336-37 (N.D. Tex. 2004) (denying motion to dismiss consumer's § 1692d claim on ground that consumer "may be able to show that [debt collector's] repetitive communication with [consumer] . . . at his home when [consumer] was represented by counsel constituted harassing, oppressing, [or] abusing . . . conduct"). Moreover, as noted, there is some uncertainty as to the precise pattern of calls placed to plaintiff's work number and to her parents' home number. *See* n.2 *supra*. Accordingly, the court will deny plaintiff's cross-motion for summary judgment as to her § 1692d claim.

### B.    "Bona Fide Error" Defense

Even when a debt collector has violated the FDCPA, it may avoid liability upon showing "by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). This "bona fide error" defense is an affirmative defense, on which the debt collector bears the burden of proof. *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1006 (9th Cir. 2008). Thus, to avail themselves of the defense, defendants must show: (1) that their FDCPA violations were unintentional; (2) that these violations resulted from a bona fide

---

[12]*Compare Jeter*, 760 F.2d at 1178-80 (holding that § 1692d "does not as a matter of law proscribe" threatening to sue consumer and warning consumer that such suit may cause the consumer embarrassment, inconvenience, and further expense), *with Horkey*, 333 F.3d at 774 (holding that debt collector's "obscenity-laced message" unequivocally was "abusive as a matter of law").

error; and (3) that the bona fide error occurred despite defendants' maintenance of procedures reasonably designed to avoid such errors. *Beck v. Maximus, Inc.*, 457 F.3d 291, 297-98 (3d Cir. 2006).

Defendants' assertion of the bona fide error defense in this case is based on their contention that the communications at issue were sent to plaintiff because of Scavone's "clerical error" in deleting and then mistakenly failing to re-enter the diary code reflecting that plaintiff was represented by counsel. (Defs.' Br. 2-3, 5-6; Defs.' Opp'n 3-4.) Although defendants concede both that Scavone made this coding error only in plaintiff's Account 2 (Pl.'s Counterstatement ¶ 26; Defs.' Resp. ¶ 26), and that a second EAA employee (McGraw) later deleted the counsel code from plaintiff's Account 1 (Pl.'s Counterstatement ¶ 23; Defs.' Resp. ¶ 23), defendants do not assert the bona fide error defense with respect to McGraw's error (*see* Defs.' Br. 2-3, 5-7 (addressing only Scavone's error); Defs.' Opp'n 3-4 (same, even after plaintiff addressed McGraw's error in response to defendants' summary judgment motion)). Accordingly, the court will address the bona fide error defense only as it relates to Scavone's error.

With respect to the first element of the defense, plaintiff argues that defendants cannot show that EAA's FDCPA violations were unintentional because they intentionally initiated the communications in question. (Pl.'s Mem. 8.) Although the Third Circuit has not addressed the issue, several other circuit courts have held that to satisfy the intent requirement of § 1692k(c), a debt collector need show only that "the violation was unintentional, not that the communication itself was unintentional," recognizing that "[t]o hold otherwise would effectively negate the bona fide error defense." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998); *see also Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006) ("[T]he only workable interpretation of

13

the intent prong of the FDCPA's bona fide error defense is that a debt collector must show that the violation was unintentional, not that the underlying act itself was unintentional."); *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005) (same).[13]  As to whether EAA's violations, as opposed to its communications, were unintentional, the court finds that there is a genuine factual issue.  While Ratchford testified that plaintiff's accounts were selected to receive the communications at issue "accidentally," because the counsel code mistakenly had been deleted from her accounts (Ratchford Dep. 67-68, 71-72), he also acknowledged having initiated calls to plaintiff on Account 1 before the counsel code had been removed from that account (*id.* at 75-76), casting doubt on this explanation.  In arguing that the violations were unintentional, defendants point to the lack of evidence that *Scavone* intended to violate the FDCPA in deleting and failing to re-enter the counsel code from plaintiff's account.  (Defs.' Br. 5.)  Regardless of Scavone's intent, the fact that *EAA* placed phone calls to plaintiff on Account 1 at a time when that account still showed that plaintiff was represented by counsel casts doubt on defendants' assertion that plaintiff's accounts were selected to receive automated calls and letters only because of Scavone's mistake.

Plaintiff also disputes that EAA's violations "resulted from a bona fide error," arguing that Scavone's coding error did not cause EAA's improper communications with plaintiff.  With

_____

[13] *Piper v. Portnoff Law Associates*, 274 F. Supp. 2d 681 (E.D. Pa. 2003), *aff'd*, 396 F.3d 227 (3d Cir. 2005), cited by plaintiff, does not hold to the contrary.  In that case, the defendants intentionally had failed to include statutorily required language from their collection letters on the mistaken belief that the FDCPA did not apply to municipal assessments and liens against real property.  *Id.* at 686.  Noting that "a majority of circuit courts have held that [the bona fide error defense] is only available for clerical and factual errors," the court held that defendants' intentional exclusion of the required language was not a bona fide error.  *Id.* at 688.  The court did not address the separate requirement that the violation be "not intentional."

respect to the communications EAA directed to plaintiff and her parents on Account 1, the court

agrees. As noted, Scavone made his coding error only in plaintiff's Account 2. (Pl.'s

Counterstatement ¶ 26; Defs.' Resp. ¶ 26.) Scavone did not access plaintiff's Account 1, and

there is no evidence that his error in Account 2 had any effect on Account 1, which, as Ratchford

acknowledged, continued to show that plaintiff was represented by counsel until January 17,

2008, months after Scavone deleted the counsel code from Account 2. (Ratchford Dep. 75-76;

Pl.'s Ex. K (Account 1 notes at 3-4).) Because defendants' assertion of the bona fide error

defense is limited to Scavone's error and because defendants, who bear the burden of proving

each element of this affirmative defense, have produced no evidence that Scavone's error caused

EAA's communications to plaintiff and her parents on Account 1, the bona fide error defense is

not available with respect to those communications.

With respect to the communications initiated by EAA on plaintiff's Account 2, however,

the court finds that there is a genuine factual issue as to whether Scavone's coding error caused

those communications. Defendants' evidence on the issue of causation consists of Ratchford's

deposition testimony that the deletion of the counsel code caused plaintiff's accounts to "f[a]ll

into a callable range," and that had the counsel code not been deleted, plaintiff would not have

received the calls and letters at issue. (Ratchford Dep. 67-68, 71-72.) As noted, however,

plaintiff received calls on Account 1 before the counsel code had been deleted from that account

(*id.* at 75-76; Pl.'s Ex. K (Account 1 notes at 3-4)), and her receipt of these calls undermines

Ratchford's assertion that the deletion of the codes is what caused the improper contacts.

Plaintiff also notes that Stevan Goldman, the owner of CLS and the original author of the

collection software used by EAA, testified that "automated letters are not affected by diary

codes" (Pl.'s Ex. M ["Goldman Dep."] 61), providing additional evidence that defendants'

explanation for what caused the improper communications is incorrect.[14]

As to the third element of the bona fide error defense – the "maintenance of procedures

reasonably adapted to avoid any such error," 15 U.S.C. § 1692k(c) – defendants rely on their use

of the CLS software and, within that software, of diary codes that, according to defendants, if

entered correctly, will prevent automated communications to represented consumers.  (*See* Defs.'

Br. 6-8; Defs.' Opp'n 4-6.)  Defendants also refer to the training that all EAA debt collectors

receive on the use of the CLS software.  (Defs.' Br. 7; Defs.' Statement ¶ 12.)

Plaintiff disputes that EAA's procedures were reasonable, arguing that EAA failed to use

the software properly to denote a consumer's represented status and to prevent communications

to represented consumers, and noting that the software failed to prevent calls to plaintiff on

Account 1 on January 10 and 12, 2008, even though the counsel code had not yet been deleted

from that account.[15]  In particular, plaintiff argues that EAA's reliance on a practice of deleting

and re-entering a diary code to reflect that a consumer was represented by counsel was

---

[14] Plaintiff also argues that Scavone's deletion of the counsel code was not a "bona fide" error because the error occurred more than once and because Scavone made the error "without doing the usual review," *i.e.*, without reviewing the history of plaintiff's account to determine whether she was represented by counsel (*see* Pl.'s Mem. 9-10), but neither of these arguments has merit.  Although the counsel code was deleted from both of plaintiff's accounts, Scavone was responsible for only one of the deletions.  And, unlike McGraw, who deleted the counsel code without noticing that plaintiff was represented by counsel (McGraw Dep. 42-44), Scavone testified that he forgot to re-enter the counsel code after deleting it, not that he failed to notice it (Scavone Dep. 49, 51).

[15] Plaintiff asserts that the call placed to Account 1 on January 17, 2008, also occurred prior to McGraw's removal of the counsel code from that account that same day (Pl.'s Mem. 13), but the paperless file for Account 1 reflects that the counsel code was deleted at 13:50:28, and that the call was placed at 18:38:58 (Pl.'s Ex. K (Account 1 notes at 4)).

unreasonable in light of alternatives in the software for recording this information that are not susceptible to the type of human error that occurred here. Plaintiff points specifically to EAA's failure to use the adverse attorney feature of the software, which, once activated, would have provided a reminder that plaintiff was represented by counsel whenever her accounts were accessed and which would have been unaffected by the entry or deletion of diary codes. Plaintiff also cites EAA's failure to take advantage of a security feature of the software to protect the represented by counsel diary code from being deleted except by subset of authorized users.

Defendants argue that the record does not support plaintiff's argument that EAA misused the CLS software because Goldman, the original author of the software, confirmed that EAA's use of diary codes was appropriate. (Defs.' Reply 5.) Goldman's testimony, however, is hardly unequivocal. Although he initially testified that "the best way to code an account to reflect that a consumer is represented by counsel" is by using the adversary attorney feature (Goldman Dep. 26), and that it would be a "misuse of the system to use a diary code to designate an adversary attorney" (*id.* at 34), he later declined to say that the adversary attorney feature was the "proper" method for determining whether a consumer was represented by counsel, noting that "there's more than one way to skin a cat" (*id.* at 65). When asked specifically about EAA's practice of deleting and re-entering diary codes, he stated that the process made sense but as a "second layer of notification" on top of the notification provided by the adverse attorney feature. (*Id.* at 42; *see also id.* at 41 (diary codes provide "a second reminder in a funny kind of way").) Moreover, although Goldman stated that EAA's use of diary codes had the advantage of bringing the fact that a consumer is represented by counsel to the collector's attention "on a daily diary report basis as opposed to simply looking at the account," he also testified that the drawback of EAA's

method was its susceptibility to the kind of error that occurred here.  (*Id.* at 57 ("[T]he drawback is that if they make a mistake like this and fail to put [the code] back in after removing it, then obviously it wouldn't appear in a way that they were counting on.").)  Significantly, Goldman also testified that it is the adversary attorney feature, and not the diary codes, "that prevents automated letters from going out."  (*Id.* at 67; *see also id.* at 61 ("The automated letters are not affected by diary codes[,] . . . [but] by the adversary attorney code . . . .").)

Plaintiff also argues that defendants' reliance on the CLS software cannot excuse the contacts initiated by defendant Ratchford because, as an attorney, Ratchford had an obligation to review plaintiff's file before contacting her but failed to do so.  (Pl.'s Mem. 14-15.)  In support of this argument, plaintiff cites a series of cases in which courts have found mass-produced debt collection letters sent out under an attorney's signature and threatening some form of action on the account to be false and misleading in violation of the FDCPA.  (*Id.* (citing *Avila v. Rubin*, 84 F.3d 222 (7th Cir. 1996); *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993), and *Crossley v. Lieberman*, 868 F.2d 566 (3d Cir. 1989).)  In reaching this conclusion, the court in *Clomon* found that "the use of an attorney's signature [on a collection letter] implies – at least in the absence of language to the contrary – that the attorney signing the letter formed an opinion about how to manage the case of the debtor to whom the letter was sent," an implication that was false where the signing attorney "played virtually no day-to-day role in the debt collection process – and certainly did not engage in any discussion . . . about how to collect [the consumer's] debt."  988 F.3d at 1321.[16]  But it is not at all clear that any of the communications at issue in this case even

---

[16] *See also Avila*, 84 F.3d at 229 (noting that a debt collection letter from an attorney threatening legal action "implies that the attorney has reached a considered, professional judgment that the debtor is delinquent and is a candidate for legal action"); *Crossley*, 566 F.2d at

purported to be from an attorney, and none of them threatened any action with respect to plaintiff's accounts. (*See* Pl.'s Ex. E (statement attached as Ex. 6 to deposition of William Regan, reciting that calls to plaintiff's parents purported to come from "David Weisberg" of EAA, stated that call was an attempt to collect a debt, and requested that plaintiff return the call); Pl.'s Counterstatement ¶ 12 (auto-dialed calls initiated by Ratchford "purport[ed] to come from a 'David Weisberg'"); Pl.'s Ex. L (letters to plaintiff on EAA letterhead signed by Joe Lynch, who is not among the attorneys listed in the letterhead and who is identified in only letter as an "Account Representative").) There is thus no basis to suggest that Ratchford's failure to review plaintiff's file before authorizing automated calls to her even rendered those communications false and misleading (which plaintiff does not allege), much less that it renders the bona fide error defense unavailable.

The court is mindful that the § 1692k(c) "only requires collectors to adopt *reasonable* procedures," *Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004) (emphasis added), and that at least one court has held that the statute's use of "[t]he word 'reasonable' . . . cannot be equated to 'state of the art,'" *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 497-98 (7th Cir. 2007).[17] Nevertheless, having chosen to rely on the CLS software to prevent communications

---

570-71 (noting that "[a] debt collection letter on an attorney's letterhead conveys authority and credibility" and finding attorney's letter threatening legal action to be false and misleading in several respects).

[17] In *Hyman*, on which defendants rely, the court affirmed the trial court's finding that a debt collector had in place reasonable procedures to avoid contacting consumers who had filed for bankruptcy where the debt collector relied on its creditor not to refer debtors in bankruptcy and immediately ceased collection efforts upon learning of a bankruptcy filing. 362 F.3d at 967-68. The court rejected the consumer's argument that the debt collector also should be required to independently confirm that the accounts forwarded by the creditor were not in bankruptcy, noting that cost to the debt collector of doing so would be about $1.5 million annually and that only .01

with represented consumers, EAA was obligated to use that software in an effective manner. Because there are factual disputes as to whether EAA did so, the court cannot determine at the summary judgment stage whether EAA's procedures were "reasonably adapted to avoid . . . error." Defendants' motion for summary judgment on the basis of the bona fide error defense will therefore be denied. Likewise, the existence of genuine issues of material fact as to the defense requires the court to deny plaintiff's cross-motion for summary judgment as to defendants' liability for violations of 15 U.S.C. §§ 1692c(a)(2) and 1692c(b) as to Account 2.

## IV.    Conclusion

As set forth above, defendants have conceded that EAA's written and telephonic communications to plaintiff violated 15 U.S.C. § 1692c(a)(2), and the court has determined that EAA's phone calls to plaintiff's parents violated 15 U.S.C. § 1692c(b). Although defendants have raised the bona fide error affirmative defense as to plaintiff's Account 2, the court finds that, with respect to those communications initiated by EAA on Account 1, the defense has not been raised. Accordingly, the court will grant plaintiff's cross-motion for summary judgment as to defendants' liability for violations of 15 U.S.C. §§ 1692c(a)(2) and 1692c(b) as to Account 1.[18]

---

percent of the accounts referred were later learned to be in bankruptcy. *Id.* at 968. In *Ross*, another case addressing a debt collector's procedures to avoid contacting consumers in bankruptcy, the court held that in conducting a computerized search of bankruptcies, the debt collector was not required to employ search methods "at the technological frontier" in order for the search to be reasonable. 480 F.3d at 497-98. Here, in contrast, the issue is not whether EAA should have used additional or different technology but whether it made reasonably effective use of its existing technology.

[18] The court notes that while the record is clear that EAA sent only one letter to plaintiff on Account 1 (Pl.'s Counterstatement ¶ 19; Defs.' Resp. ¶ 19), there is some uncertainty as to the exact number of calls that were placed to plaintiff's work number and to her parents' number on that account (*see* n.2 *supra*).

Because factual disputes preclude the court from deciding whether the bona fide error defense is applicable as to EAA's communications to plaintiff on Account 2, and because it is a jury question whether EAA's pattern of communications violated 15 U.S.C. § 1692d, plaintiff's cross-motion will otherwise be denied. The court will also deny defendants' motion for summary judgment. An appropriate order accompanies this memorandum.